864 So.2d 466 (2004)
Laverica BURCH, etc., et al., Appellants,
v.
SUN STATE FORD, INC., Appellee.
No. 5D02-2807.
District Court of Appeal of Florida, Fifth District.
January 2, 2004.
*468 Daryl D. Parks and Kendra N. Davis, of Parks & Crump, LLC, Tallahassee, for Appellants.
Dennis R. O'Connor and Warren B. Kwavnick, of Cooney, Mattson, Lance, Blackburn, Richards & O'Connor, P.A., Ft. Lauderdale, for Appellant, Willie Gene Beauford, Jr.
Gina Caruso Albanese and Robert K. Tucker, of Hinshaw & Culbertson, Ft. Lauderdale for Appellee, Sun State Ford, Inc.
Lucinda A. Hofmann, of Holland & Knight LLP, Miami, Amicus Curiae, Attorneys for Florida Defense Lawyers Association, for Appellee, Sun State Ford.
TORPY, J.
Appellants, as joint personal representatives of Aaryon Miles' estate, challenge the entry of summary judgment in favor of Appellee, Sun State Ford, Inc., ("Sun State") in this wrongful death case. The lower court determined that Sun State, as owner of the vehicle driven by Willie Gene Beauford, Jr. ("Beauford"), was not vicariously liable under the dangerous instrumentality doctrine ("the doctrine") because Beauford's manner of driving amounted to intentional misconduct. We reverse.
Beauford drove his girlfriend, Teresa Wilson ("Wilson"), and her friend, Bridget Lee ("Lee"), to the Caribbean Club, a nightclub in Orange County. Beauford dropped Wilson and Lee off and went to visit with a friend. Later, Beauford picked up Wilson and Lee from the Caribbean Club and dropped them off at another club, Hero's. While Wilson and Lee were in Hero's, Beauford played cards with a friend, during which time he drank "a couple of beers." Approximately two hours after dropping Wilson and Lee off at Hero's, Beauford returned to Hero's to pick them up. When he arrived, he observed Wilson and Lee getting into a car being driven by the decedent, Aaryon Miles ("Miles"). As the vehicle drove by, Beauford observed Lee and Miles arguing. He began to follow the vehicle, eventually catching up to them at a red light.
At some point Miles stopped his vehicle; Beauford then got out of his vehicle and approached Miles' vehicle. When Beauford approached, Miles drove off. Beauford returned to his vehicle and began to chase Miles' vehicle. During the chase, both vehicles traveled at high rates of *469 speed and committed numerous traffic violations. The chase ended, however, when Miles lost control of his vehicle and hit a tree. The collision resulted in the death of Miles and severe injuries to Wilson and Lee. Beauford denied that he had intended to harm any of the occupants of the vehicle. He stated that he followed them because it looked like they were arguing and he was curious and concerned for the safety of Wilson and Lee.
The vehicle Beauford was driving belonged to Sun State. Sun State had rented the vehicle to Beauford's sister who, in turn, had loaned it to Beauford. As a result of the incident, Beauford was convicted of willful or wanton reckless driving. Based upon Beauford's conviction, the court concluded that no material dispute existed as to the fact that Beauford had engaged in intentional misconduct and that summary judgment was compelled by the First District's decision in Caetano v. Bridges, 502 So.2d 51 (Fla. 1st DCA 1987). We disagree that Caetano requires this conclusion, but to the extent that it does, we decline to follow Caetano.
In Caetano, the defendant borrowed her father's car and drove to Pensacola Beach to look for her boyfriend. When she found her boyfriend, he was in a local drinking establishment in the company of two other women. She waited for him in the parking lot, observed him walking hand-in-hand with the two women, became angry and tried to run him over. Although her boyfriend escaped injury, she injured one of the women (the plaintiff) in his company. The facts were in dispute, however, as to whether she intended to injure the plaintiff or run over her disloyal boyfriend.
The trial court granted summary judgment for the owner of the vehicle, finding that the doctrine did not apply. The First District reversed, holding that, because the evidence was in dispute as to whether the defendant intended to injure the plaintiff, summary judgment was not appropriate. In articulating the legal premise upon which it based its holding, the Caetano court stated, without explanation, that the doctrine does not apply when an "operator is involved in intentional misconduct which is not foreseeable." Id. at 53. What the court meant by "intentional misconduct," however, is not clear because the phrase is susceptible of more than one interpretation. This explains the fact that both Appellants and Sun State cite Caetano as authority for their conflicting positions.
Appellants urge that "intentional misconduct," as used by Caetano, means the type of conduct that occurred there the use of a motor vehicle in a weapon-like manner with the specific intent to injure the plaintiff. Sun State, on the other hand, asks that we construe Caetano's "intentional misconduct" language very literally to exclude from the doctrine's application any type of intentional misuse of a vehicle, including reckless driving.[1] Although such a construction seems contrary to the result reached in Caetano, one district court has cited Caetano for the proposition espoused by Sun State. See Sun Chevrolet, Inc. v. Crespo, 613 So.2d 105 (Fla. 3d DCA 1993) (doctrine only applies to negligent operation of vehicle, citing Caetano). While we do not fully agree with either party's position, we reject Sun State's position because we disagree with its interpretation of Caetano. Alternatively, to the extent that Caetano may be read to stand for the proposition that any type *470 of intentional misuse of a vehicle results in the severance of liability under the doctrine, we decline to follow it. We conclude that such a proposition is inconsistent with the Florida Supreme Court's decisions that created and refined the doctrine, the established tort precepts upon which the doctrine was based, and the policies underlying the doctrine.
The dangerous instrumentality doctrine was adopted by the Florida Supreme Court in 1920. Southern Cotton Oil Co. v. Anderson, [80 Fla. 441,] 86 So. 629 (Fla. 1920). It is premised on the belief that a vehicle, when used for its designed purpose, is likely to cause serious injury to others. Id. at 634. Although originally only applicable in the master-servant context, the doctrine was later extended to bailments, including lessor-lessee relationships. Lynch v. Walker, [159 Fla. 188,] 31 So.2d 268 (Fla.1947). The doctrine imposes strict liability upon the owner of a motor vehicle by requiring that an owner who "gives authority to another to operate the owner's vehicle, by either express or implied consent, has a nondelegable obligation to ensure that the vehicle is operated safely." Aurbach v. Gallina, 753 So.2d 60, 62 (Fla.2000). The doctrine is intended to foster greater financial responsibility to pay for injuries caused by motor vehicles because the owner is in the best position to ensure that there are adequate resources to pay for damages caused by its misuse. Id. at 62. The doctrine also serves to deter vehicle owners from entrusting their vehicles to drivers who are not responsible by making the owners strictly liable for any resulting loss.[2]
The only state to have adopted the doctrine by judicial decision, Florida's doctrine is unique and has few exceptions. Aurbach, 753 So.2d at 62. Hertz Corp. v. Jackson, 617 So.2d 1051 (Fla.1993). It borrows characteristics from both concepts of strict liability based upon ultra-hazardous activity and vicarious liability under master-servant law. Anderson, 86 So. at 630-32. Liability of the owner is said to be "strict" because a plaintiff need not prove that an owner negligently entrusted the vehicle to its operator for liability to attach. However, the doctrine is distinguished from strict liability for ultra-hazardous activity, because the plaintiff must prove some fault, albeit on the part of the operator, which is then imputed to the owner under vicarious liability principles. Id. Although under master-servant law, the master is vicariously liable for the acts of the servant when the servant acts within the scope of his employment, the doctrine imputes liability to an owner even when the operator disobeys restrictions on the use of the vehicle, unless the disobedience rises to the level of theft or conversion. Jackson, 617 So.2d at 1054; Susco Car Rental Sys. of Fla. v. Leonard, 112 So.2d 832, 836 (Fla.1959). As stated in Leonard:
Where dangerous instrumentalities are utilized then, contrary to ordinary master-servant law, with practical unanimity, the courts hold the master liable for damages caused thereby, even though the servant, who has the sole custody and control thereof, is at the time acting willfully, wantonly, and in disobedience to his master's order ... the public safety demands that he shall be answerable for the exercise of his servant's judgment. This underlying theory is equally applicable to the field of bailment. If the owner of such a vehicle cannot, in the performance of his primary duty to the public to see that it is *471 used in a safe and proper manner, substitute or delegate such duty to a servant, then neither can he by contract substitute a bailee, except, of course, as between the parties to such contract.
Id. at 836. (emphasis supplied).
Because an owner's liability is "strict" and his obligation is to "ensure that the vehicle is operated safely," without regard to whether the operator is disobedient, it follows logically that the manner of an operator's bad driving should not generally affect the owner's liability. Moreover, a distinction based on the manner of driving contravenes the policies that underlie the doctrine: to provide greater financial responsibility to pay for injuries and to encourage owners to entrust their vehicles to responsible drivers, thereby reducing the risk of injuries to others. Absent any countervailing policy for allowing an owner to escape liability when, instead of entrusting his car to a negligent driver, he entrusts it to a reckless one, we fail to see why the doctrine should be limited in the fashion urged by Sun State.
Rather than advancing policy considerations in support of its position, Sun State simply relies upon the holding in Anderson, that liability is imputed to an owner for the negligent operation of a vehicle, which Sun State argues should be interpreted as a manifestation of intent by the court to limit the doctrine's application to negligence cases. We do not agree, however, that the Anderson court intended that liability be imposed only for negligence but not for more egregious forms of bad driving.
Anderson was a negligence case. See, Anderson v. Southern Cotton Oil Co., 73 Fla. 432, 74 So. 975 (1917).[3] In articulating its holding, therefore, the supreme court did so only in the context of the facts there at issue. Moreover, Anderson, like all the early doctrine cases, involved a master-servant relationship. Under master-servant principles, the nature of the servant's misconduct, whether negligent, reckless, intentional, or even criminal, is irrelevant. Rather, the sole issue is whether the misdeed is committed within the scope of the servant's employment. Stinson v. Prevatt, 84 Fla. 416, 94 So. 656 (1922). The issue in Anderson was whether a master could be held liable even though the servant was using the vehicle for an unauthorized frolic. In announcing its holding, therefore, the supreme court had no reason to be particular about the nature of misconduct that can be imputed to an owner under the doctrine, because under master-servant law it makes no difference.
Since Anderson, although the issue has never been expressly addressed by our high court, other discussions of the doctrine by the court illustrate that it has yet to emphasize any particular limitation on the manner of misuse that can be imputed to an owner. See e.g., Leonard, 112 So.2d at 836 (owner liable when vehicle is "misused"); Orefice v. Albert, 237 So.2d 142, 144 (Fla.1970) (owner liable for "misuse"); Meister v. Fisher, 462 So.2d 1071, 1072 (Fla.1984) (owner liable for "misuse").
We conclude, therefore, that the doctrine is not limited to negligent operation of a vehicle and that reckless driving or other intentional misconduct by an operator does not terminate liability under the doctrine. Having so concluded, we declare conflict with Sun Chevrolet, Inc. v. Crespo, 613 So.2d 105 (Fla. 3d DCA 1993), to the extent that its holding is to the contrary.
*472 We are left to consider whether any manner of improper driving will cut off an owner's liability under the doctrine. On this issue, we conclude that, when a vehicle is used in a weapon-like manner with the intent to inflict physical injury, imputed liability under the doctrine ends.
We start our analysis of this issue by noting that the parties agree that improper driving by an operator can cut off liability under the doctrine. The point of disagreement is one of degree. Again, we address this issue without benefit of any express guidance by the supreme court. However, we believe that our conclusion finds support in established tort theory, such as principles of strict liability, from which the doctrine is derived, and the tort precept of transferred intent.
The doctrine is a derivative of the common law tort of strict liability for ultrahazardous activity. Anderson, 86 So. at 631. This common law doctrine is premised on the notion that one who exposes other persons to injury by undertaking extraordinary risk, should bear responsibility when harm results. Liability is never imposed under the strict liability doctrine, however, when an implement or machine is used for a purpose different than that for which it is designed, such as when a hammer is used as a deadly weapon. Anderson, 86 So. at 634. Operation of a vehicle falls within the strict liability doctrine because a vehicle is dangerous to others when used for its "designed purpose." Id. The liability undertaken by the owner of a vehicle, therefore, relates to the potential for injury when it is used as a conveyance. This is the liability for which an owner should be expected to provide insurance. When a vehicle causes harm because it is used like a weapon, a purpose for which it is not designed, however, the doctrine does not impose liability, unless its use in this manner is reasonably foreseeable.[4] We think that the longstanding policies behind the doctrine are adequately served without extending the doctrine's applicability to such an unforeseen use. We note that our conclusion is in agreement with the position espoused in the Restatement (Third) of Torts, § 24 (Tentative Draft No. 1, 2001), addressing strict liability for abnormally dangerous activities.[5] To the extent that Caetano can be read to stand for this proposition, we are in agreement.
To the extent, however, that Caetano stands for the proposition that an operator must have the specific intent to injure the plaintiff before liability under the doctrine will terminate, we disagree. Because intent can be transferred under the doctrine of transferred intent, we do not agree that an operator's intent to injure must be *473 directed at the injured plaintiff before imputed liability under the doctrine will terminate. City of Winter Haven v. Allen, 541 So.2d 128, 137 (Fla. 2d DCA 1989). We certify conflict with Caetano on this issue.
In sum, we hold that the doctrine applies even when an operator is involved in intentional misconduct, unless the operator makes weapon-like use of the vehicle with the intent to cause physical harm. However, if the weapon-like use of the vehicle is reasonably foreseeable to the owner, liability will be imputed nevertheless. Because this analysis involves the operator's state of mind, it will ordinarily be a question of fact for the jury.[6] In this case, summary judgment was improper. Beauford's intent in following and then chasing Miles is unclear. On this record, a jury could certainly conclude that Beauford did not intend to use his vehicle to cause physical injury.
REVERSED and REMANDED.
GRIFFIN and PALMER, JJ., concur.
NOTES
[1] In fact, a truly literal interpretation of the phrase could include any traffic infraction such as speeding, running a stop sign or going the wrong way on a one-way street, if done intentionally.
[2] Comment, Sarah E. Williams, Florida's Dangerous Instrumentality Doctrine, 25 Stetson L.Rev. 177, 179 (1995).
[3] The Anderson case was before the supreme court on two occasions. The underlying facts are set forth in the 1917 opinion, Anderson v. Southern Cotton Oil Co., 73 Fla. 432, 74 So. 975 (1917). The dangerous instrumentality doctrine was addressed in the 1920 opinion after remand, Southern Cotton Oil v. Anderson. 80 Fla. 441, 86 So. 629 (1920).
[4] As an alternative theory for our conclusion, we determine that the use of a vehicle for the purpose of intentionally inflicting injury, is an intervening act that cuts off liability under the doctrine. See Comment, Restatement (Third) of Torts, § 24 (Tentative Draft No.1, 2001).
[5] Restatement (Third) of Torts, § 24 (Tentative Draft No. 1, 2001), addressing strict liability for abnormally dangerous activities provides in part:

(a) Strict liability [for abnormally dangerous activity] is limited to physical harms that are characteristic of the risks posed by the abnormally dangerous activities....
(b) Strict liability [for abnormally dangerous activity] does not apply if the physical harm brought about by the defendant's abnormally dangerous activity... is due to the act of a third party in intentionally depriving the defendant of control over ... the activity or in intentionally causing the physical harm.
* * *
See also, Restatement (Second) of Torts, § 522 (strict liability extends to unforeseeable, reckless acts of third party, but the American Law Institute had no view if harm is intended).
[6] The operator's state of mind, of course, may be proven by circumstantial evidence.