80 So.3d 305 (2012)
James Earl RIPPY, Petitioner,
v.
James SHEPARD, Respondent.
No. SC09-1677.
Supreme Court of Florida.
January 19, 2012.
Steven L. Brannock, Celene H. Humphries, and Sarah C. Pellenbarg of Brannock and Humphries, Tampa, FL, for Petitioner.
Jennifer Cates Lester and Andrew A. Morey of Dell Graham, P.A., Gainesville, FL, for Respondent.
Sharon C. Degnan and Caryn L. Bellus of Kubicki Draper, P.A., Miami, FL, on behalf of Florida Defense Lawyers Association, as Amicus Curiae.
LABARGA, J.
James Earl Rippy seeks review of the decision of the First District Court of Appeal in Rippy v. Shepard, 15 So.3d 921 (Fla. 1st DCA 2009), which held that a farm tractor is not a dangerous instrumentality as a matter of law. In so holding, *306 the district court rejected Rippy's contentions that, because a farm tractor is a motor vehicle and because it is of such size and character as to be peculiarly dangerous in its operation, a farm tractor is a dangerous instrumentality. The First District's opinion conflicts with our precedent set forth in Meister v. Fisher, 462 So.2d 1071, 1072 (Fla.1984), where we held that the dangerous instrumentality doctrine can apply to motor vehicles other than automobiles that have the ability to cause serious injury, and Southern Cotton Oil Co. v. Anderson, 80 Fla. 441, 86 So. 629, 636 (1920), where we concluded that the weight, speed, and mechanism of an automobile or motor vehicle make it peculiarly dangerous when in operation. We have jurisdiction based on the misapplication of these decisions. See art. V, § 3(b)(3), Fla. Const.; see also Wallace v. Dean, 3 So.3d 1035, 1040 (Fla.2009) (identifying misapplication of decisions as a basis for express and direct conflict jurisdiction under article V, section 3(b)(3)). As we will explain more fully below, we conclude that a farm tractor is a dangerous instrumentality. Accordingly, we quash the decision of the First District in Rippy. We begin our discussion with an overview of the facts and procedural history of this case.

FACTS AND PROCEDURAL HISTORY
Petitioner James Earl Rippy sued Respondent James Shepard under the dangerous instrumentality doctrine after sustaining injuries caused by Shepard's farm tractor on December 16, 2004. Shepard subsequently moved to dismiss Rippy's amended complaint. The trial court granted Shepard's motion and dismissed the amended complaint with prejudice, finding that a farm tractor is not a dangerous instrumentality under Florida law and that the complaint thus failed to state a cause of action against Shepard.
On appeal, the First District also held that a farm tractor is not a dangerous instrumentality. Rippy, 15 So.3d at 923. In so holding, the First District rejected Rippy's contention that, because the Legislature defines a farm tractor as a "motor vehicle" and regulates its use, a farm tractor is a dangerous instrumentality. Id. at 922. The district court also rejected Rippy's assertion that, because "it is of such size and character as to be peculiarly dangerous in its operation," a farm tractor is a dangerous instrumentality. Id. at 923. Rippy now challenges the district court's ruling.

ANALYSIS
The parties in this case dispute whether a farm tractor is a dangerous instrumentality. The issue presents a pure question of law and is thus subject to this Court's de novo review. See D'Angelo v. Fitzmaurice, 863 So.2d 311, 314 (Fla. 2003) (stating that pure questions of law are reviewed de novo).
Generally speaking, Florida's dangerous instrumentality doctrine imposes "vicarious liability upon the owner of a motor vehicle who voluntarily entrusts that motor vehicle to an individual whose negligent operation causes damage to another." Aurbach v. Gallina, 753 So.2d 60, 62 (Fla. 2000) (citing S. Cotton Oil Co., 86 So. at 637). The doctrine applies to any "instrumentality of known qualities [that] is so peculiarly dangerous in its operation" as to justify application of this common law principle. S. Cotton Oil Co., 86 So. at 638 (on petition for rehearing).
The dangerous instrumentality doctrine is an old and well-settled rule that can be traced back to English common law. Early in its development, the doctrine applied to objects that "common knowledge and common experience proved to be ... potent *307 sources of danger." Id. at 631. We first applied the doctrine to automobiles in Southern Cotton Oil Co., where we noted:
[O]ne who authorizes and permits an instrumentality that is peculiarly dangerous in its operation to be used by another on the public highway is liable in damages for injuries to third persons caused by the negligent operation of such instrumentality on the highway by one so authorized by the owner.
Id. at 638 (on petition for rehearing). "The liability grows out of the obligation of the owner to have the vehicle, that is not inherently dangerous per se but peculiarly dangerous in its use, properly operated when it is by his authority on the public highway." Id. at 632 (quoting Anderson v. S. Cotton Oil Co., 73 Fla. 432, 74 So. 975, 978 (1917)).
We have previously explained the purpose and premise of the dangerous instrumentality doctrine as follows:
The dangerous instrumentality doctrine seeks to provide greater financial responsibility to pay for the carnage on our roads. It is premised upon the theory that the one who originates the danger by entrusting the automobile to another is in the best position to make certain that there will be adequate resources with which to pay the damages caused by its negligent operation.
Kraemer v. General Motors Acceptance Corp., 572 So.2d 1363, 1365 (Fla.1990). The doctrine is based on "the practical fact that the owner of an instrumentality which [has] the capability of causing death or destruction should in justice answer for misuse of this instrumentality by anyone operating it with his knowledge and consent." Meister, 462 So.2d at 1072 (emphasis omitted) (quoting Jordan v. Kelson, 299 So.2d 109, 111 (Fla. 4th DCA 1974)).
When we first applied the dangerous instrumentality doctrine to an automobile in Southern Cotton Oil Co., we examined at length the dangerous character of the automobile as operated on the public highways. S. Cotton Oil Co., 86 So. at 631-33. In his concurring opinion, which the majority adopted, Justice Whitfield observed:
The automobile or motor vehicle is an instrumentality of service, whose weight, speed, and mechanism make it peculiarly dangerous when in operation on public highways.
Among the principles of the common law, that are designed to conserve the public safety, are those that require the exercise of due care in the use on the public highways of instrumentalities that are peculiarly dangerous in their operation, and impose upon the owner of such an instrumentality liability to persons for injuries to them proximately caused by the negligent use of the instrumentality upon the public highways by any one who has the authority or permission of the owner to use or operate it. These principles are applicable to the use of any instrumentality that may be produced by human skill, which materially increases the hazards of travel upon the public highways....
S. Cotton Oil Co., 86 So. at 636 (Whitfield, J., concurring). Importantly, we have since held that the dangerous instrumentality doctrine is not limited to motor vehicles being operated on a public highway and may apply to a motor vehicle operated on private property. See Meister, 462 So.2d at 1073.
Subsequent to our decision in Southern Cotton Oil Co., Florida courts have extended the doctrine to golf carts, trucks, buses, airplanes, tow-motors, and other motorized vehicles. See, e.g., Meister, 462 So.2d at 1071 (golf carts); see also id. at 1072 (recognizing trucks and buses *308 as dangerous instrumentalities); Orefice v. Albert, 237 So.2d 142, 145 (Fla.1970) (airplanes); Eagle Stevedores, Inc. v. Thomas, 145 So.2d 551, 552 (Fla. 3d DCA 1962) (tow-motors). We are now asked to consider whether the dangerous instrumentality doctrine applies to farm tractors. For the reasons that follow, we hold that it does.
A primary factor in determining whether an object is a dangerous instrumentality is whether the object at issue is a motor vehicle. See, e.g., Meister, 462 So.2d at 1072. Clearly, a farm tractor is a motor vehicle as it has been defined as such by the Legislature. For instance, section 316.003(12), Florida Statutes (2004), defines a farm tractor as "[a]ny motor vehicle designed and used primarily as a farm implement for drawing plows, mowing machines, and other implements of husbandry." The Legislature also refers to a farm tractor as a motor vehicle in section 322.01(19), Florida Statutes (2004). Additionally, the Legislature has enacted regulations to ensure the safe operation of farm tractors. For instance, the Legislature requires farm tractors manufactured or assembled after January 1, 1972, to be equipped with "vehicular hazard-warning lights visible from a distance of not less than 1,000 feet to the front and rear in normal sunlight" whenever operated on a highway. § 316.2295(1), Fla. Stat. (2004). Such farm tractors are generally required to be equipped with slow-moving vehicle emblems, as well as lamps and reflectors that meet certain specifications. § 316.2295(2), (5), Fla. Stat. (2004).
The dissent expresses concern that our decision expands the dangerous instrumentality doctrine beyond its original intent, which was to address harm to the public arising from the negligent use of an instrumentality that is peculiarly dangerous in its operation during its primary, rather than occasional, use. Dissenting op. at 309-10. The dissent is correct that no one test is determinative of whether an instrumentality is dangerous. However, the contention in the dissent that this Court's ruling in Meisterthat a golf cart is a dangerous instrumentality"sets the bar" low, see dissenting op. at 312, and the resulting implication that this has become the one touchstone by which all other instrumentalities are measured, is incorrect. Further, one point of significance in our decision in Meister is that we clearly held that the fact "[t]hat the vehicle is being operated on the public highways of this state is likewise not required before the dangerous instrumentality doctrine can come into play." Meister, 462 So.2d at 1073. We quoted with approval in Meister from the decision of the Fourth District Court of Appeal in Reid v. Associated Engineering of Osceola, Inc., 295 So.2d 125 (Fla. 4th DCA 1974), where that court stated:
We see neither reason nor logic in the view that a motor vehicle in operation, which is a dangerous instrumentality while being operated upon the public highway, somehow ceases to be a dangerous instrumentality the instant the driver causes it to turn off the public street or highway and onto a private drive or other private property. Although it is most probable that a motor vehicle being operated on private property would be moving at a slower speed than one being operated upon the public street or highway, common sense tells us that in all other respects such vehicle while in motion is equally dangerous to persons and property no matter where it is operated, and to make the owner's liability for his permittee's negligence in the operation of such vehicle depend upon whether the vehicle is on or off the public highway simply leads to absurd results.
*309 Meister, 462 So.2d at 1073 (quoting Reid, 295 So.2d at 129) (emphasis added).
This same logic leads to the inescapable conclusion that even though a tractor is most commonly operated on farm property, it is not solely operated in that context. Tractors are also operated in road right-of-way maintenance, commercial landscaping, and in construction settings. It is an instrumentality often seen on public highways and rights-of-way, performing these varied services. Moreover, it is common knowledge that tractors vary in size but are often powerful vehicles of such size and speed that wherever they are operated, they can be dangerous to those persons who come into contact with them. Just as we said in Meister that "a golf cart when negligently operated on a golf course, has the same ability to cause serious injury as does any motor vehicle operated on a public highway," Meister, 462 So.2d at 1073, it can be said that a tractor when negligently operated on private property has the same ability to cause serious injury as does any motor vehicle operated on a public highway. Our decision today is in accord with these criteria and is not based, as the dissent suggests, simply on "a comparison between the device at issue and a golf cart." Dissenting op. at 312.
Based on "common knowledge and common experience," there is no doubt that a farm tractor is peculiarly dangerous in its operation so as to justify the imposition of vicarious liability. See S. Cotton Oil Co., 86 So. at 631, 638. The weight, speed, and mechanism of farm tractors render their negligent use peculiarly dangerous to others. Furthermore, farm tractors frequently operate along state roads and other public areas, thereby subjecting the public to danger of injury. Cf. Harding v. Allen-Laux, Inc., 559 So.2d 107, 108 (Fla. 2d DCA 1990) (holding that a forklift that was often operated along the edge of a state road was a dangerous instrumentality under the facts of the case). Accordingly, given their "potent source of danger," there can be no question that a farm tractor is an instrumentality that materially increases the hazards of travel. Id. at 631, 636. We therefore hold that a farm tractor is a dangerous instrumentality as a matter of law.
Based on the foregoing, we quash the decision of the First District Court of Appeal in Rippy v. Shepard, 15 So.3d 921 (Fla. 1st DCA 2009), and remand the case to the First District for proceedings consistent herewith.
It is so ordered.
PARIENTE, LEWIS, QUINCE, and PERRY, JJ., concur.
POLSTON, J., dissents with an opinion, in which CANADY, C.J., concurs.
POLSTON, J., dissenting.
I respectfully dissent. The majority expands the dangerous instrumentality doctrine, a common law doctrine unique to Florida that was initially created to address the harm to the public arising from the negligent use of an instrumentality that is peculiarly dangerous in its operation. See S. Cotton Oil Co. v. Anderson, 80 Fla. 441, 86 So. 629 (1920) (on petition for rehearing). But the cases decided by this Court and the district courts of appeal have failed to adhere to this legal standard in a way that may be predictably applied, and the doctrine has become arbitrary.[1]
*310 The application of the doctrine has generally been based on the danger to the public caused by the primary use of the instrumentality rather than by where it may occasionally be operated. For instance, this Court has held that golf carts are dangerous instrumentalities because of their use on public golf courses, which thereby threaten the safety of the public on those courses. See Meister v. Fisher, 462 So.2d 1071 (Fla.1984). Further, an automobile has been held to be a dangerous instrumentality because of its use on roadways and potential harm to the public there. See S. Cotton, 86 So. 629.
In this case, based upon the doctrine's focus on the primary use of the instrumentality and the resulting danger to the public, the First District properly observed that farm tractors "are neither used as a mode of transportation nor routinely operated in public places as to pose a sufficient danger to the public." Rippy v. Shepard, 15 So.3d 921, 923 (Fla. 1st DCA 2009). In contrast, the majority erroneously finds the doctrine applicable even though farm tractors are primarily used on private property, not around the public, and the farm tractor in this case was being used on private property.

I.
In 1920, this Court set forth the Florida's dangerous instrumentality doctrine as follows:
[O]ne who authorizes and permits an instrumentality that is peculiarly dangerous in its operation to be used by another on the public highway is liable in damages for injuries to third persons caused by the negligent operation of such instrumentality on the highway by one so authorized by the owner.
S. Cotton, 86 So. at 638. The doctrine "seeks to provide greater financial responsibility to pay for the carnage on our roads" and is "premised upon the theory that the one who originates the danger by entrusting the [instrumentality] to another is in the best position to make certain that there will be adequate resources with which to pay the damages caused by its negligent operation." Kraemer v. Gen. Motors Acceptance Corp., 572 So.2d 1363, 1365 (Fla.1990). Further, once a device is deemed a dangerous instrumentality, it retains that legal characterization no matter where it is operated. See Meister, 462 So.2d at 1073; Reid v. Associated Eng'g of Osceola, Inc., 295 So.2d 125, 129 (Fla. 4th DCA 1974).
It is important to note that a dangerous instrumentality is not synonymous with a dangerous per se item. This Court explained the difference as follows:
Wild animals and high explosives are dangerous per se; that is, they may inflict injury without the immediate application of human aid or instrumentality. Neither a locomotive, a trolley car, nor an automobile is dangerous per seby or through itselfin that neither can inflict injury to a person, except by its use or operation. A locomotive in the roundhouse, a trolley car in the barn, an automobile in a garage, are almost as harmless as canary birds; but in operation *311 they are dangerous instrumentalities....
S. Cotton, 86 So. at 632.
While dangerous instrumentalities are not dangerous per se, the dangerous instrumentality doctrine borrows the concept of strict liability from the common law dangerous per se doctrine. See S. Cotton, 86 So. at 630-32. Under the dangerous instrumentality doctrine, "[l]iability of the owner is said to be `strict' because a plaintiff need not prove that an owner negligently entrusted the vehicle to its operator for liability to attach." Burch v. Sun State Ford, Inc., 864 So.2d 466, 470 (Fla. 5th DCA 2004) (relying on S. Cotton, 86 So. at 630-32). But, unlike the common law dangerous per se doctrine, the plaintiff in a dangerous instrumentality action "must prove some fault, albeit on the part of the operator, which is then imputed to the owner under vicarious liability principles." Id.
This concept of vicarious liability is borrowed from master-servant common law. See S. Cotton, 86 So. at 632 ("The servant is empowered by the master to discharge certain duties, and it is incumbent upon him to exercise the same care and attention which the law requires of the master; and if that care and attention be about the management and custody of dangerous appliances, the master cannot shift the responsibility connected with the custody of such instruments to the servant to whom they have been entrusted, and escape liability therefor.") (quoting Barmore v. Vicksburg, S. & P. Ry. Co., 85 Miss. 426, 38 So. 210, 214 (1904)). However, contrary to master-servant law, the dangerous instrumentality doctrine "imputes liability to an owner even when the operator disobeys restrictions on the use of the [instrumentality], unless the disobedience rises to the level of theft or conversion." Burch, 864 So.2d at 470 (citing Hertz Corp. v. Jackson, 617 So.2d 1051, 1054 (Fla.1993); Susco Car Rental Sys. of Fla. v. Leonard, 112 So.2d 832, 836 (Fla.1959)).
The dangerous instrumentality doctrine is unique to the State of Florida. See Aurbach v. Gallina, 753 So.2d 60, 62 (Fla. 2000) (noting that the doctrine is unique to Florida). "Only the courts of Florida have gone the length of saying that an automobile is a `dangerous instrumentality,' for which the owner remains responsible when it is negligently driven by another." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 73, at 524 (5th ed. 1984).
Significantly, the doctrine lacks any precise legal standards that courts may apply when determining whether an instrumentality is a dangerous instrumentality. See Canull v. Hodges, 584 So.2d 1095, 1097 (Fla. 1st DCA 1991) ("The criteria used by the court in the two opinions in the Southern Cotton Oil cases have been selectively abandoned or utilized to expand the list of instruments deemed to be dangerous...."). Courts often consider whether the device falls within the statutory definitions of a motor vehicle. See, e.g., Meister, 462 So.2d at 1072; Rippy, 15 So.3d at 922-23; Eagle Stevedores, Inc. v. Thomas, 145 So.2d 551, 552 (Fla. 3d DCA 1962). However, whether the item is a motor vehicle is not controlling. See Edwards v. ABC Transp. Co., 616 So.2d 142 (Fla. 5th DCA 1993) (holding that a trailer is not a dangerous instrumentality even though it meets the statutory definition of a motor vehicle); Harding v. Allen-Laux, Inc. 559 So.2d 107 (Fla. 2d DCA 1990) (holding that a forklift is a dangerous instrumentality even though it is not statutorily a motor vehicle). Further, courts often, but not always, consider the extent to which the Legislature has regulated the item. Compare Meister, 462 So.2d at 1072; S. Cotton, *312 86 So. at 634; Rippy, 15 So.3d at 922-23; with Harding, 559 So.2d at 108.
In particular, courts vary tremendously in how they assess the danger the instrumentality at issue poses to the public, which is a key question in determining the applicability of the doctrine. Courts sometimes consider the number and seriousness of accidents caused by the device. See S. Cotton, 86 So. at 633 (listing figures for the number of deaths caused by automobiles); Meister, 462 So.2d at 1073 (quoting expert witness' statement that "the types of accidents caused by the operation of the carts are due to the particular design features of the carts and are identical to those involving other motor vehicle accidents"); Festival Fun Parks, LLC v. Gooch, 904 So.2d 542, 543 (Fla. 4th DCA 2005) (noting testimony that "less than 3% of all [concession go-kart] riders have `incidents' and that less than 1% are injured seriously enough to require emergency room treatment"). And in a nod to the dangerous per se common law roots of the doctrine, some courts analyze the particular characteristics of the device, such as its speed, size, and lifting ability. See Festival Fun Parks, 904 So.2d at 543 (noting that the top speeds of concession go-karts range from 14 to 20 miles per hour); Canull, 584 So.2d at 1097-98 (noting that road graders cannot lift items or people high off the ground); Harding, 559 So.2d at 108 (noting that a forklift is a large vehicle with "protruding steel tusks").
Additionally, in assessing the instrumentality's danger to the public, some courts consider whether the instrumentality is routinely operated in close proximity to the public. See Meister, 462 So.2d at 1073 ("Florida's tremendous tourist and retirement communities make golf carts and golf courses extremely prevalent in this state."); Rippy, 15 So.3d at 923 (explaining that farm tractors are not routinely operated in public places). Other courts consider the location of the instrumentality when the injury involved in the case occurred. See Harding, 559 So.2d at 108 (considering the fact that the forklift was operating on a public highway at the time); Eagle Stevedores, 145 So.2d at 552 (noting that the tow-motor caused the injury on a public street).
Furthermore, because the Court's prior ruling that a golf cart is a dangerous instrumentality "sets the bar" so low, the decision of whether a device is a dangerous instrumentality can even come down to a comparison between the device at issue and a golf cart. For example, the Second District in Harding, 559 So.2d at 108, conducted the following analysis:
If an owner of a golf cart is liable under Florida's dangerous instrumentality doctrine for the golf cart's operation on a golf course by a lessee, Meister v. Fisher, 462 So.2d 1071 (Fla. 1984), surely the owner of this larger, four-wheel vehicle with protruding steel tusks is liable under this doctrine for its operation on a public highway by a lessee.
In other words, does the instrumentality at issue appear to be more dangerous than a golf cart?
Contrary to the majority's discussion of my dissent, I do not believe a golf cart "has become the one touchstone by which all other instrumentalities are measured." Majority op. at 308. Instead, I believe the dangerous instrumentality doctrine currently lacks any precise legal standards, which makes its application arbitrary and which creates odd comparisons in some instances to golf carts. As a result, the doctrine has lost its original meaning and purpose.
Given the lack of a uniform set of factors courts consider when deciding whether to apply the dangerous instrumentality doctrine, I disagree with the majority's conclusion *313 that the First District misapplied the doctrine in Rippy. See majority op. at 306. In fact, contrary to the majority's analysis, the First District actually considered the underlying question of the doctrine, namely whether the instrumentality is so peculiarly dangerous in its operation that it poses a significant danger to the public. See S. Cotton, 86 So. at 638. The First District properly considered this question when it explained that farm tractors are not routinely operated in public areas. Rippy, 15 So.3d at 923. In other words, how can an instrumentality be deemed a sufficient danger to the public to justify the application of the dangerous instrumentality doctrine when the instrumentality is not generally operated near the public so as to pose a danger to the public? While I agree with the majority that farm tractors operated on roadways present a danger to the public, that is not the primary use for farm tractors, as noted by the First District, and location of occasional use is not a determining factor. See Meister, 462 So.2d at 1073; Reid, 295 So.2d at 129.
The majority's decision in this case exemplifies the problems associated with a limitless doctrine that lacks legal standards. For instance, the majority admits that farm tractors are "most commonly operated on farm property" away from the public. Majority op. at 309. However, the majority emphasizes that farm tractors can occasionally be operated in closer proximity to the public when conducting road maintenance, landscaping, and construction activities. Id. Because the majority now rules that the device at issue can be used around the public sometimes but not primarily, there are no limits on what can fall under the dangerous instrumentality doctrine in the future.

II.
In conclusion, if this Court had jurisdiction, I would approve the First District's application of the dangerous instrumentality doctrine in Rippy because the First District properly analyzed the ultimate question of whether a farm tractor is peculiarly dangerous in its operation as to pose a significant danger to the public. With the majority's expansive application of the doctrine to farm tractors that are not primarily used around the public, and was not being used around the public in this case, the doctrine seems to have lost its original meaning. What instrumentality would not seem more dangerous than a golf cart?
Accordingly, the Florida Legislature may wish to address this common law doctrine that is unique to Florida and adopt a more predictable legal standard for imposing vicarious liability for the negligent operation of instrumentalities. I respectfully dissent.
CANADY, C.J., concurs.
NOTES
[1] Additionally, because there is no conflict between the First District's decision in Rippy and the decisions cited by the petitioner (or those cited by the majority), this Court does not have jurisdiction in this case. See art. V, § 3(b)(3), Fla. Const. The decisions applied the dangerous instrumentality doctrine in the context of completely different pieces of machinery. See Meister v. Fisher, 462 So.2d 1071 (Fla.1984) (holding that a golf cart is a dangerous instrumentality); S. Cotton Oil Co. v. Anderson, 80 Fla. 441, 86 So. 629 (1920) (holding that an automobile is a dangerous instrumentality); Rippy v. Shepard, 15 So.3d 921 (Fla. 1st DCA 2009) (holding that a farm tractor is not a dangerous instrumentality); Harding v. Allen-Laux, Inc., 559 So.2d 107 (Fla. 2d DCA 1990) (holding that a forklift is a dangerous instrumentality). The varying conclusions regarding the particular pieces of machinery involved in these decisions, however, contradict a common sense understanding of what is dangerous and demonstrate the arbitrary nature of the doctrine.