112 So.2d 832 (1959)
SUSCO CAR RENTAL SYSTEM OF FLORIDA, a Florida corporation, Petitioner,
v.
Arthur LEONARD, James Leonard, and Patricia Leonard, infants, by and through Arthur H. Leonard, Jr., their father and next friend, et al., Respondents.
Supreme Court of Florida.
May 8, 1959.
Rehearing Denied June 23, 1959.
*833 Knight, Smith, Underwood & Peters and William M. Hocveler, Miami, for petitioner.
Truett & Watkins, and Franklyn Levenson, Miami, for respondents.
DREW, Justice.
The decision of the District Court of Appeal, Third District, in this cause has been certified by that court for review by certiorari, under the terms of Article V, *834 Section 4(2), Florida Constitution, F.S.A.,[1] as one which passes upon a question of great public interest "because the decision involves an important new point of law which will have an effect on U-drive-it car rental business throughout the state and will also affect members of the public generally."
The stipulated facts upon which the decision is based were in substance as follows:
"(a) Humberto Salicetti rented a 1956 Chevrolet from petitioner, Susco Car Rental System of Florida, Inc., on September 18, 1956 (TR-1).
"(b) A contract of rental was entered into by and between petitioner and Mr. Salicetti. A photocopy of the Agreement is a part of the attached transcript. (TR-3). By the terms of the contract (TR-3), Mr. Salicetti certified that no one except himself would drive the car without express written consent of the petitioner. When the rental contract was signed, Mr. Salicetti was advised by petitioner's manager that the car was to be driven by no one other than himself (Mr. Salicetti) because this was a condition of the insurance contract and the rental contract.
"(c) On September 19, 1956, petitioner's car was involved in a collision with respondent's vehicle. Petitioner's car was being operated by Domingo Gonzales, who was unknown to petitioner.
"(d) Respondents sued the petitioner in the Circuit Court of Dade County. A Motion for Summary Judgment filed by petitioner was granted by the Circuit Court and judgment, on April 25, 1957, was entered in favor of petitioner. (TR-4)."
The sole issue presented by the parties for determination in the District Court was "whether or not the owner company is relieved of responsibility for damages resulting from the operation of the vehicle by someone other than the person to whom it was rented, when such operation is contrary to the expressed terms of the printed contract, and the oral instruction * * * at the time of rental." [103 So.2d 244] Limiting its decision to this point, the court held that "the provision in the contract between the owner and the bailee was not sufficient to bar all liability of the owner for the negligent operation of the auto by a person other than the bailee, and that therefore the summary final judgment must be reversed."[2]
The preliminary contention by respondents in this Court is that the question decided was not one of "great public interest" in the constitutional sense; that the court erred in so certifying; and that consequently this Court is without jurisdiction in the premises.
Whatever merit this argument might have had before the District Court in opposition to issuance of the certificate,[3] the language of Article V does not, on its face, leave the point open to contest in this forum. Our jurisdiction in this class of cases is that we "may review by certiorari any decision of a district court of appeal * * * that passes upon a question certified by the district court of appeal to be of great public interest."[4] (Emphasis supplied.) Certification is plainly a condition precedent to any review here upon this ground. A negative decision by the district court in the exercise of its discretion in a given case[5] would certainly present no basis for review *835 under the quoted language. Similarly, where a decision involves a question which has, incontrovertibly, been "certified by the district court of appeal to be of great public interest," then the specified condition has been fully met. No review or redetermination of the point is necessary or even proper unless by some stretch of reasoning the exercise of the power of certification could be found reviewable under related clauses defining other areas of appellate jurisdiction of this Court.
The distinction is apparent between this provision and companion clauses providing, for example, for review by certiorari of "any decision * * * that is in direct conflict with [other specified decisions]."[6] As already delineated by a number of opinions, the review of decisions under the latter provision is conditioned upon our determination of the existence of the jurisdictional fact of conflict.[7] In other jurisdictions such conflict has been made the basis of certification, and actual existence of such a conflict is not in that situation an open question in the reviewing court:
"In some jurisdictions where there is an intermediate appellate court, the intermediate court has authority to allow an appeal from its decision upon any question of law which, in its opinion, ought to be reviewed by the court of last resort because of the importance of the question, the doubtfulness of the lower court's decision, or a conflict between the decisions of two or more intermediate courts. * * *"[8]
The decisions cited in support of this statement will, on close analysis, sustain the preceding construction of the constitutional language involved in this case.[9] We find no contrary opinion, although there is authority for the proposition, not raised or pertinent in the case at bar, that such a certificate would not cover or prevent inquiry as to whether a decision actually involves or properly "passes on" a particular question.[10]
Concluding, then, that the cause must be considered and disposed of in regular course as any certiorari proceeding before this Court, we proceed to the material inquiry. On the fundamental issue, the simple but sound statement of the district court can be unequivocally endorsed:
"When this defendant turns over an automobile to another for a price, he in actuality intrusts that automobile to the renter for all ordinary purposes for which an automobile is rented. The fact that the owner had a private contract or secret agreement with the renter cannot make such restrictions a bar to the rights of the public. The restrictions agreed upon do not change the fact that the automobile was being used with the owner's consent. Nor does it appear that the car was not being used for the purpose for which it was rented i.e., the pleasure, convenience or business of the renter."
That opinon contains a thorough and exhaustive treatment of the development of the dangerous instrumentality doctrine in Florida, with which we are in substantial accord.[11] To this we might add an observation that, whatever may have been the deviations from this course, the logical rule, and, we think, the prevailing rationale of the cases, is that when control of such a vehicle is voluntarily relinquished to *836 another, only a breach of custody amounting to a species of conversion or theft will relieve an owner of responsibility for its use or misuse. The validity or effect of restrictions on such use, as between the parties, is a matter totally unrelated to the liabilities imposed by law upon one who owns and places in circulation an instrumentality of this nature.
The Florida cases initially applying this doctrine in the field of automobile liability law clearly support this conclusion. "The principles of the common law do not permit the owner of an instrumentality that is * * * peculiarly dangerous in its operation, to authorize another to use such instrumentality on the public highways without imposing upon such owner liability for negligent use. The liability grows out of the obligation of the owner to have the vehicle * * * properly operated when it is by his authority on the public highway."[12]
The non-delegable nature of this obligation is apparent from a consideration of the doctrine in the master-servant relation:
"`The servant is empowered by the master to discharge certain duties, and it is incumbent upon him to exercise the same care and attention which the law requires of the master; and, if that care and attention be about the management and custody of dangerous appliances, the master cannot shift the responsibility connected with the custody of such instruments to the servant to whom they have been intrusted, and escape liability therefor. This rule arises from the absolute duty which is owing to the public by those who employ in their business dangerous agencies or appliances, engines, or instruments liable, if negligently managed, to result in great damage to others."[13]
The disobedience, or contractual violations, of one to whom such an instrumentality is entrusted can no more logically exonerate a bailor than a "master" or employer:
"Says the Supreme Court of the United States: `The intrusting such a powerful and dangerous engine as a locomotive, to one who will not submit to control, and render implicit obedience to orders, is itself an act of negligence the "causa causans" of the mischief; while the proximate cause, or the ipsa negligentia which produces it, may truly be said, in most cases to be the disobedience of orders by the servant so intrusted. If such disobedience could be set up by a railroad company as a defense, when charged with negligence, the remedy of the injured party would in most cases be illusive. * * * Any relaxation of the stringent policy and principles of the law affecting such cases could be highly detrimental to the public safety.' Phiadelphia & Reading R. Co. v. Derby, 14 How. 468, 14 L.Ed. 502."[14]
Some of the apparent inconsistencies in the cases result from efforts to reason within the confines of inapplicable principles, such as those of respondeat superior. Confusion can be reduced by recognition that liability under this doctrine is imposed independent of other theories of vicarious responsibility in tort law. Where dangerous instrumentalities are utilized then, contrary to ordinary master-servant law, "with practical unanimity the courts hold the master liable for damages caused thereby, even though the servant, who has the sole custody and control thereof, is at the time acting willfully, wantonly, and in disobedience to his master's order. * * * the public safety demands that he shall be answerable for the exercise of his servant's judgment."[15] This underlying theory is *837 equally applicable to the field of bailment. If the owner of such a vehicle cannot, in the performance of his primary duty to the public to see that it is used in a safe and proper manner, substitute or delegate such duty to a servant, then neither can he by contract substitute a bailee, except, of course, as between the parties to such contract.
There can be no doubt from current statistics that the dangerous character of motor vehicles has become more obvious than when originally so denominated by this Court,[16] and the number and complexity of police regulations has vastly increased. But just as was noted at the outset in this jurisdiction, it has been the legislative view that the public interest requires more than regulation of operation, and that safety regulations can never, in fact, eliminate the enormous risks involved. Responsibility under the law was accordingly attached to ownership of these instrumentalities, evinced first by registration laws and now by numerous provisions to assure financial responsibility of owners.[17] It is plain that these provisions are based on the assumption that an owner cannot deliver a vehicle into the hands of another without assuming, or continuing, his full responsibility to the public. Such statutory provisions would, of course, be quite nugatory if ultimate liability could be escaped by contract of the owner.
In the final analysis, while the rule governing liability of an owner of a dangerous agency who permits it to be used by another is based on consent, the essential authority or consent is simply consent to the use or operation of such an instrumentality beyond his own immediate control. Only to that limited extent is the issue pertinent when members of the public are injured by its operation, and only in a situation where the vehicle is not in operation pursuant to his authority, or where he has in fact been deprived of the incidents of ownership, can such an owner escape responsibility. Certainly the terms of a bailment, either restricted or general, can have no bearing upon that question.
For the reasons herein stated and those contained in the opinion of the District Court, the judgment of that Court in this case is hereby affirmed.
TERRELL, C.J., and ROBERTS, THORNAL and O'CONNELL, JJ., concur.
THOMAS, J., dissents.
NOTES
[1] "The supreme court may review by certiorari any decision of a district court of appeal * * * that passes upon a question certified by the district court of appeal to be of great public interest * * *."
[2] Leonard v. Susco Car Rental System of Florida, Inc., Fla., D.C. 3rd Dist., 103 So.2d 243, at page 244.
[3] This is not to imply that a hearing on such certification is contemplated or required where the court, sua sponte, certifies a case as one of great public interest.
[4] Note (1) supra.
[5] Where one of the parties puts in motion the machinery to certify a question under the subject constitutional provision.
[6] Article V, Section 4, Florida Constitution.
[7] Ansin v. Thurston, Fla., 101 So.2d 808.
[8] 2 Am.Jur., App. and Err., Sec. 14.
[9] See Epstein v. Pennsylvania R. Co., 250 Mo. 1, 156 S.W. 699, 48 L.R.A.,N.S., 394; Leighton v. Hower Corp., 149 Ohio St. 72, 77 N.E.2d 600.
[10] 2 Am.Jur., App. and Err., Sec. 14. Cf. Harvey v. Thompson, 128 Ga. 147, 57 S.E. 104, 9 L.R.A.,N.S., 765; and Womack v. United States Fidelity & Guaranty Co., 208 Ga. 717, 69 S.E.2d 188.
[11] See also "The Dangerous Instrumentality Doctrine," 5 Univ. of Fla.Law Review 412.
[12] Anderson v. Southern Cotton Oil Co., 73 Fla. 432, 74 So. 975, 978, L.R.A. 1917E, 715.
[13] Southern Cotton Oil Co. v. Anderson, 80 Fla. 441, 86 So. 629, 16 A.L.R. 255, quoting from Barmore v. Vicksburg, S. & P.R. Co., 85 Miss. 426, 38 So. 210, 70 L.R.A. 627.
[14] Ibid, 86 So. 629, at page 632.
[15] Note 13, supra.
[16] Estimates of the Department of Public Safety indicate an increase in deaths attributable to this cause from 9.2 per 100,000 population in 1918 to more than 25 per 100,000 in 1957.
[17] Chapter 324, Florida Statutes, F.S.A. See also, on a related issue, Brooks v. Owens, Fla., 97 So.2d 693, dissenting opinion; People ex rel. Terry v. Fisher, 1957, 12 Ill.2d 231, 145 N.E.2d 588.