# Supreme Court of Florida

_____

No. SC2020-1311
_____

**BRUCE KYLE EMERSON,**
Petitioner,

vs.

**KYLE MICHAEL LAMBERT, et al.,**
Respondents.

November 16, 2023

COURIEL, J.

This is a case about an automobile accident involving a family car. How much the plaintiff can recover depends on the trial court's application of Florida's dangerous instrumentality doctrine. That century-old common-law rule of tort liability, as applied to traffic accidents, provides that "[t]he owners of automobiles in this state are bound to observe statutory regulations of their use, and assume liability commensurate with the dangers to which [they] or their agents subject others in using the automobiles on the public highway[s]," and accordingly, "[t]he principles of the common law do

not permit [an automobile's] owner . . . to authorize another to use such instrumentality on the public highways without imposing upon such owner liability for [the automobile's] negligent use." *S. Cotton Oil Co. v. Anderson*, 86 So. 629, 632 (Fla. 1920) (quoting *Anderson v. S. Cotton Oil Co.*, 74 So. 975, 978 (Fla. 1917)).

The doctrine serves to hold financially responsible those who originate the "dangers incident to the operation of automobiles" by entrusting such dangerous instrumentalities to others. *Id.* (quoting *Anderson*, 74 So. at 978); *see Kraemer v. Gen. Motors Acceptance Corp.*, 572 So. 2d 1363, 1365 (Fla. 1990). And in the decades since we said the doctrine was the law of our State, the Legislature has regulated who should be liable for injuries arising from the use of motor vehicles, and to what extent. *See* ch. 99-225, § 28, Laws of Fla. (capping liability for short-term lessors and owners who are natural persons); ch. 86-229, § 3, Laws of Fla. (eliminating vicarious liability for long-term automobile lessors); *see also* 49 U.S.C. § 30106(a)(1) (prohibiting states from imposing vicarious liability on car rental companies). As the Legislature did its work, we found that, under the circumstances presented in several cases before us, persons having "an identifiable property interest in [such

- 2 -

a] vehicle [including due to] . . . bailment,[1] rental, or lease of a vehicle"—not just title owners—could be liable under the doctrine. *Aurbach v. Gallina,* 753 So. 2d 60, 62-63 (Fla. 2000) (collecting cases).

Here, the Second District Court of Appeal, having considered the applicable statutes and our cases elaborating the dangerous

---

1.  A bailment is "[a] delivery of personal property by one person (the *bailor*) to another (the *bailee*) who holds the property for a certain purpose, usu. under an express or implied-in-fact contract." *Bailment, Black's Law Dictionary* (11th ed. 2019).  A bailment can arise in many circumstances.  It can be formed implicitly or expressly.  *Id.* (compare a constructive bailment, which "arises when the law imposes an obligation on a possessor of personal property to return the property to its rightful owner," with a contractual bailment, where the "terms are specified in a contract").  It can benefit one party or both.  *Id.* (compare a bailment for mutual benefit, which is one "from which both the bailor and the bailee gain some tangible advantage," with a gratuitous bailment, where "the bailee receives no compensation").  Any bailment involves the transfer of possession but not of title, giving the bailee a temporary possessory interest in the transferred property.  8 C.J.S. *Bailments* § 33 (2023) ("[W]hen a bailment occurs, there is no transfer of ownership, and the bailee acquires only a possessory interest in the property during the bailment, with the bailor retaining legal and equitable title.") (footnotes omitted).  But the type of bailment has traditionally dictated the standard of care a bailee had to exercise in possessing the property.  *See Fireman's Fund Ins. Co. v. Dollar Sys., Inc.,* 699 So. 2d 1028, 1031 (Fla. 4th DCA 1997) (discussing the effect of the bailment type on determining the standard of care).

instrumentality doctrine, held that the doctrine did not support the trial court's entry of a judgment against one spouse, whom the jury found to be a bailee of the car involved in an accident, when the other held sole title to the car; their son was driving with the permission of both parents when he injured someone. *Lambert v. Emerson*, 304 So. 3d 364 (Fla. 2d DCA 2020). That holding matters, for the petitioner ultimately received a net judgment of $18,906,429.19—that is, $18,306,429.19 more than the maximum allowed by statute against the car's owner.[2]

The Second District certified the following question of great public importance:

> UNDER THE DANGEROUS INSTRUMENTALITY DOCTRINE, CAN ONE FAMILY MEMBER WHO IS A BAILEE OF A CAR BE HELD VICARIOUSLY LIABLE WHEN THE CAR'S ACKNOWLEDGED TITLE OWNER IS ANOTHER FAMILY MEMBER WHO IS ALSO VICARIOUSLY LIABLE UNDER THE DOCTRINE?[3]

*Id.* at 374. For the reasons we explain below, the answer is no, and the Second District was correct to say so.

---

2. The current maximum liability for a person who owns a vehicle under the circumstances presented here is $600,000. *See* § 324.021(9)(b)3., Fla. Stat. (2023).

3. We have jurisdiction. *See* art. V, § 3(b)(4), Fla. Const.

# I

In January 2015, twenty-one-year-old Kyle Lambert was driving home from dinner with his girlfriend when he hit motorcyclist Bruce Emerson. *Lambert*, 304 So. 3d at 365-66. Emerson suffered severe injuries, leaving him quadriplegic. Keith Lambert, Kyle's father, owned the 2011 Hyundai Sonata Kyle was driving. The car was mainly driven by Kyle's mother, Debbie Lambert, although her name did not appear on its title.

Emerson sued Keith, Kyle, and Debbie Lambert for negligence. Against Kyle Lambert, Emerson alleged negligence in operating the car. Against Kyle's parents, Emerson alleged vicarious liability for Kyle's negligent use of the car under the dangerous instrumentality doctrine. Emerson claimed that Keith Lambert was vicariously liable as the car's titleholder, while Debbie Lambert was vicariously liable as a bailee who had allowed Kyle to drive the car.

At trial, the jury heard testimony about how the car was shared among the various members of the Lambert family. Keith Lambert testified that, while his wife mainly used the car as her "daily driver," it was a family car—family members of driving age were free simply to take an extra key and use the car as needed.

Kyle Lambert testified that, on the day of the accident, he understood that he had both his parents' permission to use the car. Keith Lambert testified that he was unsure if he spoke with Kyle about using the car on that particular day, but that Kyle had his general permission to use the car. Kyle had asked his mother to borrow the car that evening, and Debbie Lambert said he could.

At the close of Emerson's case, Debbie Lambert moved for a directed verdict. She argued that she could not be liable under the dangerous instrumentality doctrine because it did not support holding family members vicariously liable as bailees.[4] The trial court denied her motion. It concluded that our decision in *Aurbach* left open the possibility that a family member with an identifiable property interest in an automobile could be vicariously liable even if another family member legally owned the vehicle. The trial court submitted the matter of Debbie Lambert's liability to the jury, instructing them to determine whether she was a bailee and if she had authorized Kyle's use of the car on the night of the accident. The jury instructions provided:

---

4. Debbie Lambert previously moved for summary judgment on the same basis, but the trial court denied her motion.

There is a preliminary issue for you to decide. That issue is:

...

Whether Debbie Lambert was the bailee of the vehicle driven by Kyle Lambert and whether Kyle Lambert was operating the vehicle with the express or implied consent of Debbie Lambert. A person who is a bailee of a vehicle and who expressly or impliedly consents to another's use of it is responsible for its operation.

A bailee of a vehicle is one to whom the vehicle has been furnished or delivered by its owner for a particular purpose, with the understanding that it will be returned.

If the greater weight of the evidence does not support the Plaintiff's claim on this issue that Debbie Lambert was the bailee of the vehicle being driven by Kyle Lambert and that she expressly or impliedly consented to Kyle Lambert's use of the vehicle, then your verdict on the claim of the Plaintiff should be for Debbie Lambert.

However, if the greater weight of the evidence supports the claim of Plaintiff on this issue that Debbie Lambert was the bailee of the vehicle being driven by Kyle Lambert and that she expressly or impliedly consented to Kyle Lambert's use of the vehicle, then you shall decide the other issues on Plaintiff's claim.

The jury found Kyle Lambert seventy-five percent at fault for the accident and Bruce Emerson twenty-five percent at fault. *Lambert*, 304 So. 3d at 366. It also found that Debbie Lambert was a bailee who consented to Kyle's use of the car on the night of the accident. It awarded damages to Emerson totaling $27,437,306.25. Considering fault apportionment and medical and social security disability payment setoffs, the parties agreed to a net judgment of

- 7 -

$18,906,429.19.  The parties also agreed to reduce Keith Lambert's judgment to $600,000, the statutory maximum under section 324.021(9)(b)3., Florida Statutes (2015).  *Id.* at 366 n.4.  The trial court entered final judgment for $18,906,429.19 against Kyle and—key to our work in this case—Debbie Lambert.  *Id.* at 366-67.

Following the verdict, Debbie Lambert renewed her motion for a directed verdict, and the Lamberts moved for a new trial related to, among other things, alleged juror misconduct.  The trial court denied both motions.  The Lamberts appealed both decisions to the Second District Court of Appeal.

The Second District affirmed the denial of the motion for a new trial without comment but reversed the trial court's decision on Debbie Lambert's vicarious liability.  The court accepted "the jury's determination that a bailment arose between [Keith and Debbie] Lambert" without accepting the propriety of "how this jury was instructed on the law of bailments."  *Id.* at 367.  Then the court marshaled our cases to "synthesize the current state of the dangerous instrumentality doctrine":

> [I]f title owners of a car entrust their car to a family member who, in turn, causes injury, the title owners may be held vicariously liable for that tort.  If a family member

has an identifiable property interest in a car (whether a bailment or some other recognized property interest) and entrusts their car to another who, in turn, causes injury, that family member can be held vicariously liable for the tort if the title owner denies vicarious liability for that entrustment. But we do not believe there is a sound basis in the law to hold both the acknowledged title owner and a family member bailee liable for the bailee's entrustment of a car under the dangerous instrumentality doctrine.

*Id.* at 373 (emphasis and citations omitted).

On this basis, the Second District concluded that the trial court erred in denying Debbie Lambert's renewed motion for directed verdict: "Though the jury determined that she was a bailee of the Sonata . . . that is not a basis upon which vicarious liability can be applied under the dangerous instrumentality doctrine since [Keith] Lambert, the undisputed title owner, has also been found vicariously liable for what is, essentially, the same entrustment of the same vehicle." *Id.* at 374.

So the Second District reversed the final judgment against Debbie Lambert and remanded to the trial court with directions to enter a judgment in accordance with its decision, leaving before us the certified question in this case.

- 9 -

## II

Answering it requires us to say something about how a court working with the common law—that is, the law as courts have said it is in deciding cases[5]—behaves in the presence of related legislative action. For that is what we do in determining that the Second District decided this case correctly. A straightforward application of the relevant statutes and the dangerous instrumentality doctrine in its original form tells us that liability extends to Keith Lambert. The question becomes: Does it extend to Debbie Lambert?

No, it does not. For as a matter of common law and statute, in Florida, liability under the dangerous instrumentality doctrine in automobile accident cases has stemmed from a concern that a car's true owner not escape responsibility for injuries that result from its use. That concern is absent in this case. The vehicle's owner, who

---

5. One great common law scholar, in a description preordained to be cited by the courts of this State, said "it stands as a monument slowly raised, like a coral reef, from the minute accretions of past individuals, of whom each built upon the relics which his predecessors left, and in his turn left a foundation upon which his successors might work." Learned Hand, Book Review, 35 Harv. L. Rev. 479, 479 (1922) (reviewing Benjamin N. Cardozo, *The Nature of the Judicial Process* (1921)).

by statute and common law is vicariously liable for Emerson's injuries, did not increase the number of people liable to Emerson under the doctrine when he shared the car with his family members.

## A

Our decisions relevant to this case stem from the basic common law negligence principle that, on the road as in general, "all members of a civilised commonwealth are under a general duty towards their neighbors to do them no hurt without lawful cause or excuse. The precise extent of the duty, as well as the nature and extent of the recognised exceptions, varies according to the nature of the case." Frederick Pollock, *The Law of Torts: A Treatise on the Principles of Obligations Arising from Civil Wrongs in the Common Law* 1 (6th ed. 1901). When we determine the extent of common law duties, we "fix the dividing lines between those cases in which a man is liable for harm which he has done, and those in which he is not." Oliver Wendell Holmes, Jr., *The Common Law* 79 (Dover Publications 1991) (1881).

Before 1920, liability for automobile-related injuries in Florida depended on an analysis of the defendant's general common law

duties to the injured party, the defendant's breach of those duties, and the plaintiff's own negligence contributing to the injury, if any. *See Atl. Coast Line R. Co. v. Weir*, 58 So. 641, 642 (Fla. 1912) (noting that drivers had a duty to control their vehicles under "the principles of the common law," and failure to do so "[was] negligence, and the consequences of negligence are governed by applicable provisions and principles of law"); *Louisville & N.R. Co. v. English*, 82 So. 819 (Fla. 1919) (applying general tort principles in an action for automobile-related injuries); *Groover v. Hammond*, 75 So. 857 (Fla. 1917) (same); *Atl. Coast Line Ry. v. Hobbs*, 70 So. 939 (Fla. 1916) (same); *Porter v. Jacksonville Elec. Co.*, 60 So. 188 (Fla. 1912) (same).[6]

Then came *Southern Cotton Oil Co.* A company's employee was using its car on a personal errand when the employee negligently injured the plaintiff. *S. Cotton Oil Co.*, 86 So. at 636. The driver

---

6. Our cases addressing automobile-related injuries in the early twentieth century often concerned collisions with railroad cars at train crossings. *See, e.g.*, *Weir*, 58 So. at 642. At the time, statutes addressed liability in such situations by (1) shifting the burden of presumption to railroad companies to show that "their agents have exercised all ordinary and reasonable care and diligence"; and (2) limiting recoverable damages based on comparative negligence. *See id.*; §§ 3148, 3149, Gen. St. 1906.

was concededly at fault; the issue was the company's liability. "This responsibility," we said, "must be measured by the obligation resting on the master or owner of an instrumentality that is peculiarly dangerous in its operation, when he intrusts it to another to operate on the public highways." *Id.* at 631. Even though the employee was attending to a purely personal matter outside the scope of his employment, we concluded that the company was liable for the employee's negligent operation of its vehicle. *Id.* at 635 ("An automobile being a dangerous machine, its owner should be held responsible for the manner in which it is used; and his liability should extend to its use by any one with his consent." (quoting *Ingraham v. Stockamore*, 118 N.Y.S. 399, 401 (N.Y. Sup. Ct. 1909))). We drew on two well-settled principles: An owner of a dangerous thing is strictly liable for its negligent operation, and a principal is vicariously liable for the negligent conduct of an agent. *See id.* at 636 ("In intrusting the servant with this highly dangerous agency, the master put it in the servant's power to mismanage it, and as long as it was in his custody or control the master was liable for any injury which might be committed through his negligence.").

We also looked to what the Legislature had done. And in part because "the Legislature regarded automobiles as dangerous machines," we turned from an approach, adopted in other jurisdictions, that focused primarily or exclusively on the conduct of drivers.[7] *Id.* at 634 (quoting *Ingraham,* 118 N.Y.S. at 400).

We announced this principle of liability:

> [O]ne who authorizes and permits an instrumentality that is peculiarly dangerous in its operation to be used by another on the public highway is liable in damages for injuries to third persons caused by the negligent operation of such instrumentality on the highway by one so authorized by the owner.

*Id.* at 638.[8]

---

7. A century later, Florida stands alone among the states in adhering to the dangerous instrumentality doctrine as a means of holding an automobile owner responsible, under most circumstances, for the negligent use of his or her vehicle by another. *See Kraemer,* 572 So. 2d at 1365 n.2 (citing W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 73, at 524 (5th ed. 1984)).

8. Notably, because liability insurance for automobile drivers was not yet mandatory when we first applied the dangerous instrumentality doctrine to automobiles in *Southern Cotton Oil Co.,* *see* chapter 23626, Laws of Florida (1947) (enacting Florida's financial responsibility law, which included motor vehicle insurance coverage requirements for the first time); *see also* Jonathan L. Alpert & Robert A. LeVine, *Florida Practice Handbook Motor Vehicle No-Fault Law,* § 4-1 (1992) ("[t]he first Florida financial responsibility law was adopted in 1947"), we reasoned that "the

Though the dangerous instrumentality doctrine was premised on a master's ownership of the vehicle and its entrustment to a servant, in subsequent cases over the decades, we found that the doctrine's "underlying theory" applied in the bailment[9] context, when title ownership of the vehicle was removed from its actual control on the road, or when the beneficial owner of the vehicle stood in the shoes of the person with bare title to it. *See Aurbach*, 753 So. 2d at 62-63 (collecting cases); *see generally Lynch v. Walker*, 31 So. 2d 268 (Fla. 1947) (tracing the judicial development

---

remedy of the injured party would in most cases be illusive" without increasing liability for owners, *Southern Cotton Oil Co.*, 86. So. at 632 (quoting *Philadelphia & Reading Railroad Co. v. Derby*, 55 U.S. 468, 487 (1852)).

9. At common law, bailments were not primarily a way to affix liability for injuries; they instead emerged in the context of possessory remedies—getting stuff back. Possession was procedurally essential for a person to sue for a bailed thing that had been wrongfully appropriated by a party outside the bailment. The bailee, not the bailor, alone could sue for repossession. The bailor's only available action was against the bailee. Though a form of action later arose for a bailor to seek repossession from the appropriating party as the common law developed, bailees today remain answerable to their respective bailors. *See generally* Holmes, Jr., *The Bailee at Common Law*, in *The Common Law*, *supra*, at 164-205 (surveying the development of the traditional law of bailment); R. H. Helmholz, *Bailment Theories and the Liability of Bailees: The Elusive Uniform Standard of Reasonable Care*, 41 U. Kan. L. Rev. 97 (1992) (discussing the duties of a bailee).

of the dangerous instrumentality doctrine), *overruled on other grounds by Meister v. Fisher*, 462 So. 2d 1071 (Fla. 1984).

In *Herr v. Butler*, the Court for the first time held liable an owner of an automobile for injuries caused by the negligent driving of a gratuitous bailee—that is, someone who borrowed the car for free. 132 So. 815 (Fla. 1931). The owner had allowed his adult son to borrow his car while visiting from out of state when the son negligently caused an accident. Concluding that "this case comes well within the rule" in *Southern Cotton Oil Co.*, we explained that an owner is liable even if he entrusts his automobile to another to be operated solely for the latter's benefit. *Id.* at 816.

We later applied *Herr* when we considered a commercial bailment, holding a car rental agency liable for the negligent operation by a driver who had rented its vehicle. *Lynch*, 31 So. 2d at 271-72. We said: "When an owner authorizes and permits his automobile to be used by another[,] he is liable in damages for injuries to third persons caused by the negligent operation so authorized by the owner." *Id.* at 271; *see Boggs v. Butler*, 176 So. 174, 176 (Fla. 1937) ("Under the law of this state, if the owner once gives his express or implied consent to another to operate his

- 16 -

automobile, he is liable for the negligent operation of it no matter where the driver goes, stops, or starts.").

In a pair of cases arising from the same bailment for hire, we found that the dangerous instrumentality doctrine supplied a basis for holding both a bailor and its bailee liable. In *Fleming v. Alter*, we found that a rental car business was liable for injuries caused by a customer's wife who had been driving a car, notwithstanding the absence of any provision in the rental agreement for another person's use of the car. 69 So. 2d 185, 186 (Fla. 1953). And in *Frankel v. Fleming*, 69 So. 2d 887 (Fla. 1954), we affirmed a judgment against the man who had rented the car and allowed his wife to drive it when she injured the plaintiff. "Proof of actual ownership of the vehicle causing injury," we said, "is not indispensable to recovery, for the misfortune of the injured person should not depend entirely on the repository of the legal title; nor is recovery dependent upon perfection of title in a given person." *Id.* at 888 (citation omitted).

But neither did we recede from the basic connection between ownership and liability. For in *Metzel v. Robinson*, we considered the liability of an aunt who had financed and taken title to a vehicle

- 17 -

for her nephew to use; the seller had objected to an eighteen-year-old signing the financing paperwork. 102 So. 2d 385, 385 (Fla. 1958). The nephew made all car payments. The aunt insured the vehicle in her name to comply with state law but had no further involvement. We reasoned that "[the aunt] was still in a position to exert some dominion and control over the vehicle." *Id.* at 386. She therefore maintained an ownership interest as a matter of law and "could have been held liable for the accident." *Id.*

In the following years, we reaffirmed the "non-delegable nature" of ownership liability under the doctrine, starting with *Susco Car Rental System of Florida v. Leonard.* 112 So. 2d 832, 836 (Fla. 1959). There, we determined that a rental agency was financially responsible for the negligent operation of its vehicle by a person not named in the rental contract, even though the individual who had rented the car agreed in the contract to be the sole driver. *Id.* at 834; *see also Kraemer*, 572 So. 2d at 1364-67 (finding a long-term lessor and owner of an automobile liable for injuries incurred when an unauthorized driver of a leased automobile struck another with the car). "[W]hile the rule governing liability of an owner of a dangerous agency who permits it to be used by another is based on

- 18 -

consent," we explained, "the essential authority or consent is simply consent to the use or operation of such an instrumentality beyond his own immediate control." *Leonard,* 112 So. 2d at 837.

More recently, in *Aurbach,* we clarified that, without ownership, the right to exercise "some degree of dominion and control" over a vehicle does not necessarily bring about vicarious liability under the doctrine. 753 So. 2d at 65. In *Aurbach,* parents bought and maintained a car for their daughters to use; the car was titled exclusively in the mother's name. One of the daughters, with her mother's permission to use the car, negligently caused an accident. Both the mother and daughter conceded liability: the daughter as the operator and the mother as the titleholder. Although the father did not hold any property interest in the car, the jury specially found that he "had the right to control the vehicle." *Id.* at 65. But such "a general right to control the operation or use of the vehicle," we explained, was familial alone and thus insufficient to give rise to vicarious liability under the doctrine. *Id.* at 62.

We are left with an enduring principle of the common law that liability under the dangerous instrumentality doctrine "will

generally flow from legal title," *id.* at 66, and while persons with other property interests may be vicariously liable, the number of people liable under the doctrine is not multiplied every time a vehicle is shared. Those who "*originate*[] the danger by entrusting the automobile to another," *id.* at 62 (quoting *Kraemer*, 572 So. 2d at 1365) (emphasis added), whether directly or by "authoriz[ing] other[s]," remain principally liable, *id.* at 63.

**B**

Legislative activity has played a cardinal role in the dangerous instrumentality doctrine's development. Since its inception, the doctrine has had as its touchstone the Legislature's power to regulate the use of automobiles. *See S. Cotton Oil Co.*, 86 So. at 634. And while the courts were at work over the proceeding decades, so too was the Legislature. Along with "vastly increas[ing]" the scope and complexity of vehicle operational regulations, the Legislature enacted "numerous provisions to assure financial responsibility of owners . . . based on the assumption that an owner cannot deliver a vehicle into the hands of another without assuming, or continuing, his full responsibility to the public." *Leonard*, 112 So. 2d at 837 (citing ch. 324, Fla. Stat. (1955)).

- 20 -

Eventually, however, the Legislature began limiting vicarious liability under the doctrine. In 1986, it enacted section 324.021(9)(b), Florida Statutes (1986), to shield long-term motor vehicle lessors from vicarious liability under the doctrine:

> [T]he lessor, under an agreement to lease a motor vehicle for one year or longer . . . shall not be deemed the owner of said motor vehicle for the purpose of determining financial responsibility for the operation of said motor vehicle or for the acts of the operator in connection therewith.

Ch. 86-229, § 3, Laws of Fla. And in 1999, the Legislature added monetary caps on recovery for (1) short-term motor vehicle lessors "under an agreement to rent or lease a motor vehicle for a period of less than 1 year" and (2) "owner[s] who [are] natural person[s] and loan[] a motor vehicle to any permissive user," chapter 99-225, section 28, Laws of Florida, if they have satisfied "the requisite minimum insurance coverage specified by the statute," *Aetna Cas. & Sur. Co. v. Huntington Nat'l Bank*, 609 So. 2d 1315, 1317 (Fla. 1992).[10]

---

10. The statutory provisions relating to short-term lessors and owners were "added by the Legislature in 1999 as part of a tort reform package" known as the Tort Reform Act. *Vargas v. Enter. Leasing Co.*, 60 So. 3d 1037, 1041 (Fla. 2011); *see generally* George N. Meros, Jr. & Chanta Hundley, *Florida's Tort Reform Act: Keeping*

Section 324.021(9)(b) limits liability against certain non-operators, including vehicle owners, who are vicariously liable under the dangerous instrumentality doctrine.  Ch. 99-225, § 28, Laws of Fla.  It does not, however, codify the existence of vicarious liability or the right to recover against those liable under the doctrine.  *See Abdala v. World Omni Leasing, Inc.*, 583 So. 2d 330, 332 (Fla. 1991) ("There is no statutory right to sue a long-term lessor of an automobile for damages an individual suffers as a result of the operation of that automobile.").

The statute defines a vehicle's owner as "[a] person who holds the legal title of a motor vehicle."  § 324.021(9)(a), Fla. Stat. (2015).  Specifically discussing the monetary cap, the statute reads:

> The owner who is a natural person and loans a motor vehicle to any permissive user shall be liable for the operation of the vehicle or the acts of the operator in connection therewith only up to $100,000 per person and up to $300,000 per incident for bodily injury and up to $50,000 for property damage.

---

*Faith with the Promise of* Hoffman v. Jones, 27 Fla. St. U. L. Rev. 461, 483-85 (2000) (discussing vicarious liability of automobile owners and lessors under the Tort Reform Act).  Congress would later further limit vicarious liability under the doctrine for those "engaged in the trade or business of renting or leasing motor vehicles" through the Graves Amendment.  49 U.S.C. § 30106(a)(1) (2006); *see Vargas*, 60 So. 3d at 1041-42.

§ 324.021(9)(b)3. If the negligent operator is uninsured or has subpar insurance (insurance with limits below $500,000 combined property damage and bodily injury liability), then the owner can be liable for "up to an additional $500,000" for "economic damages only arising out of the use of the motor vehicle." *Id.* Essentially, the statute prevents an automobile owner who was not directly at fault for causing an injury from being treated the same as the operator who caused the injury.

The Legislature, in enacting section 324.021(9)(b), directly addressed compensation under the dangerous instrumentality doctrine, laying out protections for individuals who, unlike the negligent operator, were only indirectly responsible for causing the harm. *See Christensen v. Bowen*, 140 So. 3d 498, 504-05 (Fla. 2014) ("[T]he Legislature has developed a system whereby the rights and responsibilities of owners of motor vehicles are both assigned and dependent upon the existence of legal title."). All the while, our courts have continued applying the doctrine congruently with the Legislature's work. *See, e.g., id.* at 502, 504 (explaining that the Court's application of the beneficial ownership exception, also

known as the "bare legal title" exception, is "consistent with Florida's statutory scheme, in that vehicle ownership is determined through legal title" (citing § 324.021(9)(a), Fla. Stat. (2013))); *Aurbach*, 753 So. 2d at 65-66 (declining to apply the dangerous instrumentality doctrine absent an identifiable property interest and noting the lack of any supporting statutory authority).

**III**

The dangerous instrumentality doctrine remains "premised upon the theory that the one who originates the danger by entrusting the automobile to another is in the best position to make certain that there will be adequate resources with which to pay the damages caused by its negligent operation." *Kraemer*, 572 So. 2d at 1365; *see S. Cotton Oil Co.*, 86 So. at 636. Because Keith Lambert originated the danger at issue here by giving Kyle blanket permission to use the car, it is he, and not Debbie Lambert, who, under the dangerous instrumentality doctrine, is in the best position to face Emerson's claim for damages. That is the teaching of our cases in light of the applicable statutes.

## A

As long as there has been a dangerous instrumentality doctrine, we have described as its "underlying rationale" the idea that a vehicle owner who gives control of the thing to another driver "commits himself or herself to the judgment of that driver and accepts the potential liability for his or her torts." *Christensen*, 140 So. 3d at 501; *see S. Cotton Oil Co.*, 86 So. at 632 ("[T]he master cannot shift the responsibility connected with the custody of such [dangerous] instruments to the servant to whom they have been intrusted, and escape liability therefor." (quoting *Barmore v. Vicksburg, S. & P. Ry. Co.*, 38 So. 210, 214 (Miss. 1905))); *Hertz Corp. v. Jackson*, 617 So. 2d 1051, 1053 (Fla. 1993) ("[A]n owner who gives authority to another to operate the owner's vehicle, by either express or implied consent, has a nondelegable obligation to ensure that the vehicle is operated properly."); *Chandler v. Geico Indem. Co.*, 78 So. 3d 1293, 1297 (Fla. 2011) (noting that a vehicle owner is liable for injuries caused by a third party's negligent use, even if that use exceeded the use authorized by the owner); *cf. Castillo v. Bickley*, 363 So. 2d 792, 793 (Fla. 1978) (holding that an owner is not liable under the dangerous instrumentality doctrine for

injuries caused by a repairman because the owner "rarely has authority and control over the operation or use of the vehicle when it is turned over to a firm in the business of service and repair").

Indeed, we concluded in *Christensen* that a co-owner who did not have actual possession of or access to his car could still be held vicariously liable for the damage it causes. 140 So. 3d at 506.[11] To reach this conclusion, we reasoned that when the title holder knowingly titled the car in his name, he gained a legal right. This right allowed him to "encumber, sell, or take possession" of the car. *Id.* at 506. That right was his, whether he used it or not. With the legal right to control property comes the legal responsibility for harm caused by that property. The co-owner thus retained sufficient control over the car, as a titleholder, to remain liable under the doctrine for any injury it caused.

---

11. The facts of *Christensen*, 140 So. 3d at 500, are as follows. A husband and wife bought an automobile as joint titleholders. They later divorced, but the husband never had his name removed from the title. At no point did the husband possess or have access to the vehicle. Around two years later, the former wife struck a pedestrian while driving the vehicle under the influence of alcohol and the pedestrian's estate sought to hold the former husband liable under the dangerous instrumentality doctrine.

A bailment, especially a gratuitous one of the kind at issue here, does not come with the same rights and responsibilities that attend title ownership.[12] *See Aurbach*, 753 So. 2d at 63 ("Legal title remains the most common basis for imposing vicarious liability under the dangerous instrumentality doctrine."). While a titleholder's control and dominion over a vehicle exists whether or

_____

12. The bailment that the jury found to exist between Keith and Debbie Lambert is not a commercial bailment; it is an implied gratuitous bailment between two private individuals—who happen, not insignificantly, to be members of a family. *See Bailment, Black's Law Dictionary* (11th ed. 2019) (defining "gratuitous bailment" as "[a] bailment for which the bailee receives no compensation, as when one borrows a friend's car"). Courts have held bailees vicariously liable under the doctrine in the context of commercial bailments. *See, e.g., Frankel*, 69 So. 2d at 888 (Frankel rented car from a rental company); *Adams v. Bell Partners, Inc.*, 138 So. 3d 1054, 1058 (Fla. 4th DCA 2014) (company rented car for employee). In the *Fleming* cases, the car's owner and bailor gave rights to his bailee in an arm's-length agreement, governed by a written contract, that gave the parties a way to provide for how risk would be borne among them, and in exchange for what economic consideration—for example, by agreeing to an indemnity or adjusting the price. *Frankel*, 69 So. 2d at 888; *Fleming*, 69 So. 2d at 186; *see also Leonard*, 112 So. 2d at 837 (We have said, and reiterate, that "an owner cannot deliver a vehicle into the hands of another without assuming, or continuing, his full responsibility to the public.") (footnote omitted). Keith and Debbie Lambert, husband and wife, have a different relationship. Keith gave Debbie (and their son Kyle) permission to use the car, gratuitously and without a contract setting out its terms, because they are family.

not possession is maintained, *Christensen*, 140 So. 3d at 506, a bailee's control over a vehicle relies on possession alone, *Metzel*, 102 So. 2d at 386.

In our case, it is true Kyle had Debbie Lambert's permission to use the car. That fact is immaterial to our analysis, however, as Keith Lambert—the titleholder—gave them both (and indeed all family members who could drive) the same permission to use the car.[13] Keith Lambert was found vicariously liable to the extent allowed by statute. Under these facts, we cannot agree that the dangerous instrumentality doctrine makes Debbie Lambert also vicariously liable.

In concluding as much, we sail in the wake of our decision in *Aurbach*, and find that to hold both Keith and Debbie Lambert liable "would be an improper extension of the doctrine." 753 So. 2d at 66. It would indeed extend the doctrine past its breaking point, yielding an arbitrary and impractical rule under which liability would be determined not by evaluating the vehicle's ultimate

---

13. As the Second District did below, we accept without endorsing the jury's determination that a bailment arose between Keith and Debbie Lambert. *Lambert*, 304 So. 3d at 367.

ownership and control—the doctrine's traditional focus—but on examining family relationships to identify bailments.

We would have a different case if Keith Lambert had contested consent to Kyle's use of the car. Consider *Stanford v. Chagnon*, 86 So. 3d 565 (Fla. 2d DCA 2012), where the titleholder disclaimed liability when his stepdaughter negligently operated his truck and caused an accident. The titleholder stated that he had not given his stepdaughter permission to use the truck the day of the accident, nor had he given the stepdaughter blanket permission to use the truck at her leisure. In fact, the stepdaughter admitted that she did not have her stepfather's permission to drive the vehicle. The stepdaughter had received the car keys from her mother, the titleholder's wife, who potentially had blanket permission to use the car. Under these circumstances, it is conceivable that the mother's authorization, through bailment, did empower the negligent operator.[14]

---

14. In *Stanford*, the liability of either parent was not resolved because the issue had been appealed from a grant of summary judgment. 86 So. 3d at 566. The Second District held that the trial court erred by granting summary judgment for the father because it remained in dispute if his wife "is a bailee of the motor vehicle[,] . . . [because] then it is possible that she is liable in this context for her

The Legislature has acted to limit liability under the doctrine so that owners and lessors are not as financially responsible as the permissive user who caused the harm. *See* § 324.021(9)(b); *Kraemer*, 572 So. 2d at 1367 (noting that the Legislature "recognized" the reach of vicarious liability under the doctrine and "enact[ed] . . . section 324.021(9)(b) . . . to provide relief"). There is no basis to contravene the financial liability regime in section 324.021(9)(b), or to permit its evasion through artful pleading when more than one family member has the right to direct the use of an automobile. Yet that is exactly what we would do, were we to answer the certified question in the affirmative: we would allow an end-run around section 324.021(9)(b) anytime family members shared a car, even if the automobile's titleholder were found vicariously liable to the maximum extent provided by statute.

"[A] statute is not an alien intruder in the house of the common law, but a guest to be welcomed and made at home there

---

bailment to her daughter and that her husband is liable in turn as her bailor." *Id.* at 568.

as a new and powerful aid in the accomplishment of its appointed task of accommodating the law to social needs."  Harlan F. Stone, *The Common Law in the United States*, 50 Harv. L. Rev. 4, 15 (1936). In the face of such legislative action defining the rights and duties of tortfeasors and victims in this area of the law, we decline to "expand liability in a field in which the legislature ha[s] so expressly chosen to restrict [it]."[15]  *Kitchen v. K-Mart Corp.*, 697 So. 2d 1200, 1203 (Fla. 1997); *see Bankston v. Brennan*, 507 So. 2d 1385, 1387 (Fla. 1987) ("[W]hen the legislature has actively entered a particular field and has clearly indicated its ability to deal with such a policy question, the more prudent course is for this Court to defer to the legislative branch.").

---

15. The Legislature did not repeal or curtail the dangerous instrumentality doctrine when it amended section 324.021, Florida Statutes.  *See Thornber v. City of Ft. Walton Beach*, 568 So. 2d 914, 918 (Fla. 1990) ("The presumption is that no change in the common law is intended unless the statute is explicit and clear in that regard.  Unless a statute unequivocally states that it changes the common law, or is so repugnant to [it] that the two cannot coexist, the statute will not be held to have changed [it].") (citations omitted).  We hold that no expansion of the doctrine is warranted, here—not that it has been abrogated.

# IV

The answer to the certified question is no. We affirm the decision of the Second District Court of Appeal to the extent it is consistent with this opinion.

It is so ordered.

MUÑIZ, C.J., and CANADY, GROSSHANS, and FRANCIS, JJ., concur.
LABARGA, J., dissents with an opinion.
SASSO, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., dissenting.

The majority holds that under Florida's dangerous instrumentality doctrine, one family member who is a bailee of a car cannot be held vicariously liable when the car's acknowledged title owner is another family member who is also vicariously liable under the doctrine. Because I believe that this interpretation of bailee vicarious liability is too narrow and will lead to inadequate awards of damages for severe injuries, I respectfully dissent.

The essence of the dangerous instrumentality doctrine is to attach vicarious liability to a person who, having dominion over the instrumentality, has discretion as to its use. In *Southern Cotton Oil*

- 32 -

*Co. v. Anderson*, we explained that the doctrine derives from the "old and well[-]settled principle" that "certain things are a source of extraordinary risk, and a man who exposes his neighbor to such a risk is held, although his act is not of itself wrongful, to insure his neighbor against any consequent harm not due to some cause beyond human foresight." 86 So. 629, 631 (Fla. 1920) (quoting *Pollock on Torts* at 506). Thus, liability under the dangerous instrumentality doctrine turns on the act of entrustment rather than on ownership. As the majority recognizes, we have held that various types of possessory interests give rise to dangerous instrumentality vicarious liability.

The majority, however, unduly places vicarious liability on a conceding titleholder when that titleholder and the bailee *both* entrusted the car to the bailee-tortfeasor. Subject to few exceptions, vicarious liability requires only (1) a possessory interest in the car (such as ownership, bailment, rental, or lease) and (2) the ability to exercise dominion over the car. *Aurbach v. Gallina*, 753 So. 2d 60, 62-64 (Fla. 2000). In *Aurbach*, as pointed out by the majority, "we clarified that, without ownership, the right to exercise 'some degree of dominion and control' over a vehicle does not

necessarily bring about vicarious liability under the doctrine."

Majority op. at 19 (quoting *Aurbach*, 753 So. 2d at 65). However, our holding also concluded that "[i]n the absence of common law or statutory authority, . . . a parent who holds neither legal title *nor an identifiable property interest* in a motor vehicle should not be held vicariously liable for his or her child's negligent operation of the vehicle under the dangerous instrumentality doctrine." *See Aurbach*, 753 So. 2d at 66 (emphasis added). Thus, we envisioned the potential vicarious liability of a parent who has an identifiable property interest in a motor vehicle where the parent entrusts that vehicle to a child, and the child negligently operates the vehicle causing injury. The relevant inquiry is who beyond the titleholder had a possessory interest in the car and dominion over the car such that they could make the discretionary decision to entrust the car to the bailee-tortfeasor.

In the present case, that person was Debbie Lambert, who, unlike the father in *Aurbach*, satisfies both requirements for vicarious liability to attach under the doctrine. *See id.* at 65-66. She had a possessory interest in the car because she was a bailee, and she had dominion over the car because it was her "daily

driver." Before the accident, she exercised her dominion over the car by consciously making the discretionary decision to entrust the car to her son. Thus, it is appropriate to hold her vicariously liable under the dangerous instrumentality doctrine, and the certified question should be answered in the affirmative.

Answering the certified question in the affirmative is also consistent with the doctrine's aim "to provide greater financial responsibility to pay for the carnage on our roads." *Kraemer v. Gen. Motors Acceptance Corp.*, 572 So. 2d 1363, 1365 (Fla. 1990). Allowing recourse against two defendants instead of one aligns with that goal, especially when the plaintiff suffers severe injuries like those in the present case. Precluding vicarious liability for family member bailees when the titleholder concedes vicarious liability will make the remedy "illusive," or at most inadequate, in many cases. *See S. Cotton Oil Co.*, 86 So. at 632.

While limiting liability within reason, section 324.021(9)(b), Florida Statutes, can work with the common law to assign vicarious liability to all those with a property interest in a car who are indirectly responsible for injuries arising from the negligent operation of the car. The supposed impracticality of examining

family relationships does not justify a different result.  For the above reasons, I respectfully dissent.

Application for Review of the Decision of the District Court of Appeal
Certified Great Public Importance/Direct Conflict of Decisions

Second District - Case Nos. 2D18-1872 & 2D18-4103

(Pasco County)

John S. Mills of The Mills Firm, P.A., Jacksonville, Florida, and Jonathan Martin of The Mills Firm, P.A., Tallahassee, Florida,

for Petitioner

Sarah Lahlou-Amine and Chris W. Altenbernd of Banker Lopez Gassler P.A., Tampa, Florida,

for Respondents

Bryan S. Gowdy, Jacksonville, Florida,

for Amicus Curiae Florida Justice Association

Elaine D. Walter of Boyd Richards Parker & Colonnelli, P.L., Miami, Florida, and Nicole R. Ramirez of HD Law Partners, Tampa, Florida,

for Amicus Curiae Florida Defense Lawyers Association